UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

YVETTE K. MUNROE,

          Plaintiff,

   v.

CAROLYN W. COLVIN,

          Defendant.

Case No.  13-cv-03897-MEJ

**ORDER RE: CROSS-MOTIONS FOR SUMMARY JUDGMENT**

Re: Dkt. Nos. 16, 24

## I.  INTRODUCTION

Plaintiff Yvette K. Munroe ("Plaintiff") brings this action pursuant to 42 U.S.C. § 405(g), seeking judicial review of a final decision of Defendant Carolyn W. Colvin, the Acting Commissioner of Social Security ("Defendant"), denying Plaintiff's claim for disability benefits. Pending before the Court are the parties' cross-motions for summary judgment. Dkt. Nos. 16, 24. Pursuant to Civil Local Rule 16-5, the motions have been submitted on the papers without oral argument. Having carefully reviewed the parties' positions, the Administrative Record ("AR"), and relevant legal authority, the Court hereby DENIES Plaintiff's motion and GRANTS Defendant's cross-motion for the reasons set forth below.

## II.  BACKGROUND

Plaintiff is a 43-year-old woman that alleges disability due to depression, anxiety, posttraumatic stress disorder, neck pain, lower back pain, and fibromyalgia.  AR 29.  In an undated Disability Report, Plaintiff states that she has suffered from "depression, insomnia, anxiety, lack of energy, neck and back pain . . . since [she] can remember," and that her condition limits her ability to work because she is in constant back, shoulder, and neck pain.  AR 170.  She states that she became unable to work on July 31, 2003.  AR 170.  Plaintiff lists previous work

United States District Court
Northern District of California

experience including as an Administrative Assistant, Server in a restaurant, and as a Collector and Customer Representative for a credit card company.  AR 171.

A.      **Physical Health Treatment Records**

Plaintiff's treatment records indicate that she was a patient at the Berkeley Health Center from March 2005 through October 2010, where she was treated for insomnia, depression, and chronic neck and upper back pain.  AR 622-65.  On May 5, 2010, she was diagnosed with fibromyalgia.  AR 624.

On September 14, 2009, Omar C. Bayne, M.D., conducted a consultative examination on behalf of the Social Security Administration ("SSA").  AR 387-89.  Based on his examination, Dr. Bayne determined that Plaintiff had no visual, hearing, or speech impairment, and that she could drive or take public transportation without limitation.  AR 389.  He concluded that Plaintiff could stand and walk for a total of 4 to 6 hours per 8-hour workday; sit for up to 6 hours per workday; stooping, crouching, and repetitive bending should be limited to occasionally; kneeling, crawling, and squatting should be limited to occasionally; climbing ladders should be restricted; there was no limitation in performing repetitive leg, ankle, and foot control frequently; she should be able to lift and carry 10 pounds frequently and 20 pounds occasionally; she could perform fine and gross hand, wrist, and finger manipulation on a frequent basis; she could grip, grasp, push, and pull with both hands frequently; she should be able to reach and work with both arms above the shoulder level frequently; she could flex and extend both elbows frequently; and she should be able to work in any environment, except unprotected heights.  AR 389.

Plaintiff underwent a Physical Residual Functional Capacity Assessment on September 28, 2009, with M. Acinas, M.D., a state agency physician.  AR 390-94.  Dr. Acinas found that Plaintiff could occasionally lift and/or carry 20 pounds and frequently lift and/or carry 10 pounds; stand and/or walk 6 hours in an 8-hour day; sit 6 hours in an 8-hour workday; had unlimited pushing/pulling; could frequently climb stair and ladders; occasionally balance, stoop, kneel, crouch, and crawl; had no manipulative limitations, such as reaching, handling, fingering, and feeling; had no visual or communicative limitations; and had no environmental limitations, such as

2

from exposure to noise, wetness, and extreme cold or heat.  AR 391-93.

In December 2010, rheumatologist Dr. Brian Kaye completed an initial consultation.  AR 752-55.  On physical examination, Dr. Kaye determined that Plaintiff was "an overweight but otherwise well-developed, well-nourished and healthy appearing young African American woman in no apparent distress."  AR 752-53.  Dr. Kaye found that Plaintiff had fibromyalgia, with "widespread musculoskeletal pain lasting more than three months with more than 11/18 tender points."  AR 754-55.  He noted that she had "gotten some good benefit from the Lyrica" and stated that he would like to see her do some more physical exercise once she started feeling better. AR 755.

On May 3, 2011, Plaintiff reported to Dr. Kaye that her flare-ups were better.  AR 798.  He noted that Plaintiff was not doing enough exercise and suggested that she increase her exercise by five minutes every week.  AR 798-99.  On September 13, 2011, Plaintiff reported to Dr. Kaye that her new medication had been very helpful and that she was "very happy with how she [was] doing."  AR 806.

**B.      Mental Health Treatment Records**

In January 2008, Plaintiff was referred to psychiatrist Dr. Michelle Clark for feelings of depression.  AR 320.  The referring physician had already been treating Plaintiff with Zoloft and Elavil for her depression and insomnia.  AR 320.  During her initial visit with Dr. Clark, Plaintiff described an abusive childhood, a strong family history of depression, and being beaten and raped by her former spouse.  AR 481-83.  Dr. Clark diagnosed her with Major Depression, Recurrent, Severe, non-psychotic, and assigned Plaintiff a Global Assessment of Functioning[1] of 45.  AR 483.

---

[1] "A person's Global Assessment of Functioning is a subjective determination representing the clinician's judgment of the individual's overall level of psychological, social, and occupational functioning.  The GAF scale ranges from 100 (superior functioning) to 1 (persistent danger of severely hurting oneself or others, persistent inability to maintain minimum personal hygiene, or serious suicidal act with clear expectation of death).  A GAF between 41-50 indicates serious symptoms or any serious impairment in social, occupational or school functioning.  A GAF between 51-60 indicates moderate symptoms or moderate impairment in those functioning areas." *McCaa v. Astrue*, 2008 WL 4811456, at *5 (N.D. Cal. Nov. 5, 2008).

United States District Court
Northern District of California

1      When Plaintiff saw Dr. Clark in October 2008, she noted some improvement with the

2 medications.  AR 478.  Plaintiff reported that she was feeling better, had more clarity, and was not

3 crying.  AR 478.  During a follow-up visit in December 2008, Plaintiff reported continuing

4 reduction of depressive symptoms.  AR 476.  However, in February 2009, Dr. Clark noted

5 Plaintiff's report that her medication was less effective, with Plaintiff stating that she "just can't

6 handle life" and that she felt "exhausted."  AR 474.  In April and May 2009, Dr. Clark noted some

7 improvement with Plaintiff's mood symptoms.  AR 471-72.  Plaintiff reported that she was feeling

8 better and that she had started back working out.  AR 472.

9      In September 2009, Plaintiff reported worsening symptoms, stating that the medication

10 was not working and that she felt worse than before.  AR 466.  Dr. Clark noted symptoms of

11 anergia, hypersomnia, excessive eating with weight gain, and passive suicidal thoughts.  AR 466-

12 67.  Although Dr. Clark changed Plaintiff's medications to Wellbutrin and Lunesta (AR 467), by

13 January 2010 Dr. Clark noted that the medications were not working to reduce Plaintiff's

14 symptoms and she was experiencing panic attacks with tremulousness and palpitations, with a

15 sense of "falling apart."  AR 462.  Dr. Clark added Lexapro to the medication regimen, and

16 Plaintiff reported improvement in February 2010.  AR 460, 463.  She told Dr. Clark that she was

17 "much better" and "much calmer" with no more heart palpitations.  AR 460.  Dr. Clark noted that

18 Plaintiff had excellent hygiene, a cooperative attitude, normal speech, congruent affect, good

19 judgment, and good insight and impulse control.  AR 461.  During the February visit, Dr. Clark

20 also noted that Plaintiff's cognition and thought process were normal, her medication response

21 was positive, and that she had no side effects from her medication.  AR 461.

22      On September 14, 2009, Plaintiff underwent a psychological evaluation conducted by Dr.

23 Morton Felix, Ph.D.  AR 381-85.  Dr. Felix noted that Plaintiff was "a very bright woman," and

24 that her knowledge, insight, and judgment appeared adequate.  AR 382.  Based on Plaintiff's

25 mental distress in the past, Dr. Felix found "there appears to be a mental disorder . . . which would

26 have affected her vocational consistency if no physical problems existed."  AR 385.  He diagnosed

27 her with depressive disorder, which may exist independently of her physical problems, and ruled

28

United States District Court
Northern District of California

out posttraumatic stress disorder.  AR 384.  However, he stated that further information was needed for a reasonable evaluation of her capacity to function adaptively and vocationally.  AR 384.

On October 13, 2009, State agency psychologist P. Davis, Psy.D., reviewed Plaintiff's mental health treatment records and concluded that she had mild restrictions in activities of daily living and social functioning, and moderate difficulties in concentration, persistence and pace.  AR 401-14.

In September 2010, Plaintiff began attending group therapy and individual counseling sessions with psychologists at Rubicon.  AR 746.  She also received individual treatment there from psychiatrist Dr. Brandon Vance.  AR 741, 793-94.  During his initial assessment in October 2010, Dr. Vance diagnosed Plaintiff with Anxiety NOS (possible posttraumatic stress disorder) and Major Depressive Order, recurrent.  AR 793.  Dr. Vance noted that Plaintiff's anxiety and depressive symptoms "wax and wane over time," but that her levels had stabilized during her treatment at Rubicon.  AR 793.  Dr. Vance also diagnosed major depressive disorder, recurrent, with a Global Assessment Function score of 43.  AR 777.

On August 25, 2011, Plaintiff's therapist at Rubicon noted that she had "made significant progress in her ability to develop stronger resiliency and maintenance of her awareness of her environment."  AR 845.  She was "alert x4" and while stressed due to family issues, she was calm with no pressure in her speech.  AR 845.  Her speech was "articulate and clear, thoughts were organized and thoughtful."  AR 845.  On August 31, 2011, Plaintiff reported that her medications were managing her pain better and that she was sleeping six to eight hours per night.  AR 844. She reported feeling much more capable of handling a stressful family situation due to her treatment.  AR 844.

C.      **Function Report**

On July 7, 2009, Plaintiff completed an SSA Function Report.  AR 191-98.  She listed daily activities including preparing meals, home schooling her 15-year-old son, teaching the Bible, cleaning, doing laundry, ironing, doing dishes, and mopping.  AR 191-93.  Plaintiff stated that she

United States District Court
Northern District of California

needs help to do these things, otherwise she would have to stay in bed for a few days, and that there are days in which she is unable to get out of bed due to anxiety and depression.  AR 192-93. She also stated that she is able to drive on her own, including going to church and shopping for groceries and personal items.  AR 191, 194.  Plaintiff wrote that she did not go out socially due to depression and that she tends to shut down in stressful situations.  AR 196-97.

### III.  SOCIAL SECURITY ADMINISTRATION PROCEEDINGS

On June 22, 2009, Plaintiff filed a claim for Disability Insurance Benefits, alleging disability beginning on December 1, 2007.  AR 149-55.  SSA denied Plaintiff's claim initially and on reconsideration.  AR 79-85.  On July 10, 2010, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ").  AR 101.  ALJ Timothy J. Stueve conducted a hearing on May 26, 2011.  AR 42-78.  Plaintiff testified in person at the hearing and was represented by counsel, Rosemary Dady.  The ALJ also heard testimony from Vocational Expert Jo Ann Yoshioka.

**A.** **Plaintiff's Testimony**

At the hearing, Plaintiff testified that she last worked in August 2003, after which she attended U.C. Berkeley and received a degree in Theater Performance in 2006.  AR 48-51.  As to her physical impairments, Plaintiff testified that she experiences pain in the back of her neck, which radiates to the top of her shoulders.  AR 54.  Sometimes the pain affects whether she can lift her right arm, and other times she cannot lift or hold anything because the muscles are too tight. AR 54-55.  She also stated that she has a burning pain in her arms that feels like electrical shocks. AR 55.  The pain causes her to lose control, so if she has a shock, her hand will release whatever she is holding.  AR 55.  Plaintiff also testified that she experiences constant low-level to intense pain in her lower back, pain in her left knee that sometimes will not allow her to bend.  The pain is so great that she is sometimes unable to go food shopping and when she does, she is in bed for three days.  AR 56.  She estimated that she spends 15-20 days a month in bed.  AR 73.

Plaintiff stated that her doctor had been trying to get her to do exercises, but they caused chills and body aches.  AR 59.  She testified that she could walk one block before having to stop

6

United States District Court
Northern District of California

1    and rest, could stand for about 10-15 minutes, and could sit "better," but her feet and legs go

2    numb.  AR 59.  It can take her 10 minutes to climb the stairs at home, and she has to use the

3    railing.  AR 60.  She did "a lot of letter writing" for her church and was able to walk for door-to-

4    door ministry about once a week for an hour, although she would come back tired and be in bed

5    for the next couple of days.  AR 61-62.  Plaintiff also testified that she drove a couple times a

6    week, including driving herself to the hearing, but she often needs to rest the next day.  AR 65.

7    She also cooks dinner and does laundry.  AR 65.  Plaintiff testified that her rheumatologist

8    prescribed Lyrica and that she is "at the maximum dose."  AR 66-67.  The medication causes

9    memory loss but no other side effects.  AR 67.

10           As to Plaintiff's mental impairments, she testified that she suffers from depression, but it

11   had gotten better since she started taking medication in 2007.  AR 57-58.  She also suffers anxiety

12   from posttraumatic stress disorder.  AR 58.  Plaintiff stated that she had a nervous breakdown after

13   she had graduated from Berkeley because she had a lot of time to think and begin to realize the

14   abuses she had suffered.  AR 71.  Plaintiff said she has tried different depression medications,

15   including Zoloft and Lexapro, which have caused her to gain 60 pounds.  AR 67.  She also takes

16   several different kinds of sleeping medication, including Elavil.  AR 67.

17   **B.      Vocational Expert's Testimony**

18           The vocational expert testified that Plaintiff's past work included Collection Clerk, DOT[2]

19   216.362-014, at the sedentary[3] level; Computer Operator, DOT 219.362-010, at the light[4] level;

20

21   [2] The Dictionary of Occupational Titles ("DOT"), published by the Department of Labor, lists
     requirements for various occupations.  *See* 20 C.F.R. § 416.966(d)(1).

22   [3] "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or
     carrying articles like docket files, ledgers, and small tools.  Although a sedentary job is defined as

23   one which involves sitting, a certain amount of walking and standing is often necessary in carrying
     out job duties.  Jobs are sedentary if walking and standing are required occasionally and other

24   sedentary criteria are met."  20 C.F.R. § 404.1567(a).
     [4] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of

25   objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this
     category when it requires a good deal of walking or standing, or when it involves sitting most of

26   the time with some pushing and pulling of arm or leg controls.  To be considered capable of
     performing a full or wide range of light work, you must have the ability to do substantially all of

27   these activities.  If someone can do light work, we determine that he or she can also do sedentary
     work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for

28                                                        7

1   and General Office Clerk, DOT 209.562-010, at the light level.  AR 74.  The ALJ posed the

2   following hypothetical to the vocational expert:

3           Assume an individual who could lift up to 20 pounds occasionally,
            lift or carry ten pounds frequently, stand or walk for six and sit for
4           up to six hours for an eight-hour day with normal breaks.
            Frequently climbing ramps or stairs, occasionally climbing ladders,
5           ropes or scaffolds, occasionally balancing, stooping, kneeling,
            crouching, and crawling.  This work is limited to simple, routine and
6           repetitive tasks involving only simple work related decisions with
            few, if any, workplace changes, and no interaction with the public.
7

8   AR 74.  The expert testified that such a person could not perform any of Plaintiff's past work.  AR

9   74.  The ALJ next asked if there were any other jobs in the regional or national economy that a

10  person with Plaintiff's age, education and work experience could perform with the hypothetical

11  limitations.  AR 74.  The expert provided the following jobs: Garment Sorter, DOT 222.687-014,

12  at the light level; and Folder, Laundry and Related, DOT 369.687-018, at the light level.  AR 74-

13  75.  The expert stated that both positions included 2,400 positions locally and 500,000 nationally.

14  AR 75.

15          The ALJ then presented a second hypothetical:

16          These are going  to be on mental limitations and the following four-
            point scale from unlimited through poor.  The scale goes unlimited,
17          good, fair and poor.  Poor is described as indicating an individual
            cannot usefully perform or sustain the activity while fair is described
18          as the individual's capacity to perform is impaired, but the degree
            and extent of the impairment needs to be further described.  So poor
19          ability to maintain attention, concentration and persistence; poor
            ability to complete a normal workday and workweek without
20          interruption from psychologically based symptoms; fair abilities to
            understand, remember and carry out complex instructions; fair
21          abilities to perform activities within a schedule and maintain regular
            attendance; fair abilities to respond appropriately to changes in a
22          work setting.

23  AR 75.  Based on these limitations, the expert testified that such a person could not perform

24  Plaintiff's past work, and that there were no other jobs such a person could perform.  AR 75.

25          At the end of the expert's testimony, the ALJ questioned whether her testimony had been

26

27  _____

    long periods of time."  20 C.F.R. § 404.1567(b).
28                                                  8

1    consistent with the Dictionary of Occupational Titles, and the expert confirmed that it had.  AR

2    76.

3    **C.       The ALJ's Findings**

4             The regulations promulgated by the Commissioner of Social Security provide for a five-

5    step sequential analysis to determine whether a Social Security claimant is disabled.[5]  20 C.F.R. §

6    404.1520(a).  The sequential inquiry is terminated when "a question is answered affirmatively or

7    negatively in such a way that a decision can be made that a claimant is or is not disabled."  *Pitzer*

8    *v. Sullivan*, 908 F.2d 502, 504 (9th Cir. 1990).  During the first four steps of this sequential

9    inquiry, the claimant bears the burden of proof to demonstrate disability.  *Valentine v. Comm'r*

10   *Soc. Sec. Admin.*, 574 F.3d 685, 689 (9th Cir. 2009).  At step five, the burden shifts to the

11   Commissioner "to show that the claimant can do other kinds of work."  *Id.* (quoting *Embrey v.*

12   *Bowen*, 849 F.2d 418, 422 (9th Cir. 1988)).

13            The ALJ must first determine whether the claimant is performing "substantial gainful

14   activity," which would mandate that the claimant be found not disabled regardless of medical

15   condition, age, education, and work experience.  20 C.F.R. § 404.1520(a)(4)(i), (b).  Here, the ALJ

16   determined that Plaintiff had not performed substantial gainful activity since July 31, 2003.  AR

17   27.

18            At step two, the ALJ must determine, based on medical findings, whether the claimant has

19   a "severe" impairment or combination of impairments as defined by the Social Security Act.  20

20   C.F.R. § 404.1520(a)(4)(ii).  If no severe impairment is found, the claimant is not disabled.  20

21   C.F.R. § 404.1520(c).  Here, the ALJ determined that Plaintiff had the following severe

22   impairments: depression, anxiety, posttraumatic stress disorder, degenerative disc disease of the

23   cervical spine, obesity, and fibromyalgia.  AR 27.

24            If the ALJ determines that the claimant has a severe impairment, the process proceeds to

25

26   ───────────────────

27   [5] Disability is "the inability to engage in any substantial gainful activity" because of a medical
     impairment which can result in death or "which has lasted or can be expected to last for a
     continuous period of not less than 12 months."  42 U.S.C. § 423(d) (1)(A).

28

United States District Court
Northern District of California

United States District Court
Northern District of California

1  the third step, where the ALJ must determine whether the claimant has an impairment or

2  combination of impairments that meet or equals an impairment listed in 20 C.F.R. Part 404, Subpt.

3  P, App. 1.  20 C.F.R. § 404.1520(a)(4)(iii).  If a claimant's impairment either meets the listed

4  criteria for the diagnosis or is medically equivalent to the criteria of the diagnosis, he is

5  conclusively presumed to be disabled, without considering age, education and work experience.

6  20 C.F.R. § 404.1520(d).  Here, the ALJ determined that Plaintiff did not have an impairment or

7  combination of impairments that meets the listings.  AR 28.

8  　　　　Before proceeding to step four, the ALJ must determine the claimant's Residual Function

9  Capacity ("RFC").  20 C.F.R. § 404.1520(e).  RFC refers to what an individual can do in a work

10  setting, despite mental or physical limitations caused by impairments or related symptoms.  20

11  C.F.R. § 404.1545(a)(1).  In assessing an individual's RFC, the ALJ must consider all of the

12  claimant's medically determinable impairments, including the medically determinable

13  impairments that are nonsevere.  20 C.F.R. § 404.1545(e).  Here, the ALJ determined that Plaintiff

14  has the RFC to perform light work, with the following limitations:

15  　　　　　　occasionally lifting 20 pounds; frequently lift 10 pounds; sit for up
16  　　　　　　to 6 hours in an 8-hour workday, stand or walk for approximately 6-
   　　　　　　hours in an 8-hour workday with normal breaks; frequently climb
17  　　　　　　ramps or stairs; occasionally climb ladders, ropes, or scaffolds;
   　　　　　　occasionally balance, stoop, kneel, crouch; and crawl; limited to
18  　　　　　　simple, routine and repetitive tasks; involving only simple, work-
   　　　　　　related decisions; with few, if any, work place changes; and no
   　　　　　　interaction with the public.
19

20  AR 29.

21  　　　　The fourth step of the evaluation process requires that the ALJ determine whether the

22  claimant's RFC is sufficient to perform past relevant work.  20 C.F.R. § 404.1520(a)(iv)(4), (f).

23  Past relevant work is work performed within the past 15 years that was substantial gainful activity,

24  and that lasted long enough for the claimant to learn to do it.  20 C.F.R. § 404.1560(b)(1).  If the

25  claimant has the RFC to do his past relevant work, the claimant is not disabled.  20 C.F.R. §

26  404.1520(a)(4) (iv).  Here, the ALJ determined that Plaintiff could not perform past relevant work.

27  AR 34.

28  　　　　　　　　　　　　　　　　10

In the fifth step of the analysis, the burden shifts to the Commissioner to prove that there are other jobs existing in significant numbers in the national economy which the claimant can perform consistent with the claimant's RFC, age, education, and work experience.  20 C.F.R. §§ 404.1520(g); 404.1560(c).  The Commissioner can meet this burden by relying on the testimony of a vocational expert or by reference to the Medical-Vocational Guidelines at 20 C.F.R. Part. 404, Subpt. P, App. 2.  *Lounsburry v. Barnhart*, 468 F.3d 1111, 1114 (9th Cir. 2006).  Here, based on the testimony of the vocational expert, Plaintiff's age, education, work experience, and RFC, the ALJ determined that jobs Plaintiffs could perform existed in significant numbers in the national economy.  AR 35.  These include garment sorter and laundry folder.  AR 35.

**D.     ALJ's Decision and Plaintiff's Appeal**

On July 7, 2011, the ALJ issued an unfavorable decision finding that Plaintiff was not disabled.  AR 36.  This decision became final when the Appeals Council declined to review it on June 26, 2013.  AR 3-6.  Having exhausted all administrative remedies, Plaintiff commenced this action for judicial review pursuant to 42 U.S.C. § 405(g).  On February 11, 2014, Plaintiff filed the present Motion for Summary Judgment.  Dkt. No. 16.  On May 5, 2014, the Commissioner filed a Cross-Motion for Summary Judgment.  Dkt. No. 24.

**IV.  LEGAL STANDARD**

This Court has jurisdiction to review final decisions of the Commissioner pursuant to 42 U.S.C. § 405(g).  The ALJ's decision must be affirmed if the findings are "supported by substantial evidence and if the [ALJ] applied the correct legal standards."  *Holohan v. Massanari*, 246 F.3d 1195, 1201 (9th Cir. 2001) (citation omitted).  "Substantial evidence means more than a scintilla but less than a preponderance" of evidence that "a reasonable person might accept as adequate to support a conclusion."  *Thomas v. Barnhart*, 278 F.3d 947, 954 (9th Cir. 2002) (quoting *Jamerson v. Chater*, 112 F.3d 1064, 1066 (9th Cir. 1997), *Flaten v. Sec'y of Health & Human Servs.*, 44 F.3d 1453, 1457 (9th Cir. 1995)).  The court must consider the administrative record as a whole, weighing the evidence that both supports and detracts from the ALJ's conclusion.  *McAllister v. Sullivan*, 888 F.2d 599, 602 (9th Cir. 1989).  However, "where the

11

1    evidence is susceptible to more than one rational interpretation," the court must uphold the ALJ's

2    decision.  *Magallanes v. Bowen*, 881 F.2d 747, 750 (9th Cir. 1989).  Determinations of credibility,

3    resolution of conflicts in medical testimony, and all other ambiguities are to be resolved by the

4    ALJ.  *Id.*

5          Additionally, the harmless error rule applies where substantial evidence otherwise supports

6    the ALJ's decision.  *Curry v. Sullivan*, 925 F.2d 1127, 1131 (9th Cir. 1990).  A court may not

7    reverse an ALJ's decision on account of an error that is harmless.  *Molina v. Astrue*, 674 F.3d

8    1104, 1111 (9th Cir. 2012) (citing *Stout v. Comm'r, Soc. Sec. Admin.*, 454 F.3d 1050, 1055-56

9    (9th Cir. 2006)).  "'[T]he burden of showing that an error is harmful normally falls upon the party

10   attacking the agency's determination.'"  *Id.* (quoting *Shinseki v. Sanders*, 556 U.S. 396, 409

11   (2009)).

12                              **V.  DISCUSSION**

13         In her motion, Plaintiff raises two issues: (1) the ALJ relied on deficient testimony from

14   the vocation expert in determining whether a significant number of jobs exist that she can perform;

15   and (2) the ALJ failed to provide legally sufficient reasons to reject her testimony.

16   **A.       Vocational Expert's Testimony**

17         At step five of the five-step evaluation, the ALJ found that "considering claimant's age,

18   education, work experience, and residual functional capacity, there are jobs that exist in significant

19   numbers in the national economy that claimant can perform."  AR 35.  Specifically, the ALJ

20   adopted the vocational expert's testimony that Plaintiff could perform the jobs of "garment sorter"

21   and "folder laundry."  AR 35.  Plaintiff argues that the ALJ should not have accepted the

22   vocational expert's testimony concerning the numbers of these positions that exist both regionally

23   and nationally.  Pl.'s Mot. at 3-4.  The vocational expert testified that 2,400 garment sorter

24   positions exist locally, and that 500,000 garment sorter positions exist nationally.  AR 35, 74-75.

25   She also testified that 2,400 laundry folder positions exist in the region, and that 500,000 laundry

26   folder positions exist nationally.  AR 74-75.  Plaintiff, however, contends that these numbers are

27   incorrect and are contradicted by the Bureau of Labor Statistics.  Pl.'s Mot. at 4.

28
                                        12

United States District Court
Northern District of California

1.     Legal Standard

Congress directs that, in order to be disabled under the Act, an individual must have a physical or mental impairment of such severity that she cannot perform any of her past work but also that, given her age, education and work experience, she cannot "engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work." 42 U.S.C. § 423(d)(2)(A). "'[W]ork which exists in the national economy' means work which exists in significant numbers either in the region where such individual lives or in several regions of the country." *Id.*; *see also* 20 C.F.R. §§ 404.1566(a), 416.966(a). The Commissioner has further refined the definition of "work which exists in the national economy" by directing that "[i]solated jobs that exist only in very limited numbers in relatively few locations outside of the region where you live are not considered work which exists in the national economy." 20 C.F.R. §§ 404.1566(b), 416.966(b).

In identifying the requisite work that "exists in the national economy," an ALJ may rely on vocational expert testimony. 20 C.F.R. §§ 404.1566(d), (e), 416.966(d), (e) (agency will take administrative notice of "reliable job information" including that from vocational experts); Social Security Ruling ("SSR") 00-4p (agency uses vocational experts at steps four and five of the sequential analysis).

2.     Application to the Case at Bar

Here, the ALJ relied on the vocational expert's testimony that there were 4,800 jobs in Plaintiff's region and 1,000,000 jobs nationally that someone with Plaintiff's limitations could perform. AR 35, 74-75. Plaintiff asserts that the vocational expert "did not describe" her methodology and "the ALJ did not ask" about her methodology. Pl.'s Mot. at 4, 7. However, Plaintiff cites no authority for the proposition that an ALJ must inquire as to the basis for a vocational expert's calculation of available jobs.[6] Regardless, a vocational expert's "recognized

---

[6] This situation is unlike the presumption raised by job classifications in the Dictionary of Occupational Titles because agency rules specifically impose an affirmative responsibility on the

1    expertise provides the necessary foundation for his or her testimony." *Bayliss v. Barnhart*, 427

2    F.3d 1211, 1217-18 (9th Cir. 2005).

3          Plaintiff recognizes *Bayliss*, but asserts that it "does not license the vocational expert to

4    make up numbers whether out of ignorance, sloth, or a conscious decision that identifying all of

5    the actual occupations would simply take too long." Pl.'s Mot. at 6.  Plaintiff offers no basis for

6    the belief that the vocational expert made up numbers, and her attorney did not raise this issue at

7    the hearing.  *See Gutierrez v. Comm'r of Soc. Sec*, 740 F.3d 519, 527 (9th Cir. 2014) (in rejecting

8    plaintiff's argument that the vocational expert's testimony was inherently unreliable, "we note that

9    Gutierrez did not challenge the [vocational expert's] testimony regarding the number of jobs

10   available to him in California.  Moreover, he did not explore with the [vocational expert] where

11   those jobs were in relation to his domicile in Bakersfield.").  In fact, Plaintiff's attorney expressly

12   averred to the vocational expert's qualifications.  AR 73.

13         Moreover, as Defendant points out, the vocational expert's testimony concerning the

14   number of jobs existing nationally is in line with that of other vocational experts' testimony.  *See*,

15   *e.g.*, *Foster v. Colvin*, 2013 WL 4046469, at *6 (S.D. Ala. Aug. 9, 2013) (vocational expert

16   testified that there are 500,000 garment folder positions nationally); *Ponn v. Comm'r of Soc. Sec.*,

17   2013 WL 6501309, at *3 (N. Dist. Ohio Dec. 11, 2013) (vocational expert testified that there are

18   200,000 folder positions nationally); *Perez v. Astrue*, 2012 WL 28639, at *2 (E.D. Cal. Jan. 5,

19   2012) (vocational expert testified that there would be approximately 196,000 garment sorter

20   positions nationally); *Diggs v. Astrue*, 2011 WL 2447509, at *10 (D.N.J. June 14, 2011)

21   (vocational expert testified that 1.4 million garment sorter jobs and 450,000 laundry folder jobs

22   are available nationally); *Gonzalez v. Astrue*, 2012 WL 1458094, at *2 (S.D. Tex. Apr. 26, 2012)

23   (vocational expert testified that there are 900,000 garment sorter positions nationwide).

24

25   _____

26   ALJ to assess whether the vocational expert's testimony conflicts with that publication.  *See* SSR
     00-4p, 2000 WL 1898704.  There is no such rule as to published job numbers for relevant

27   occupations and no legal basis to extend such an obligation.  *See Massachi v. Astrue*, 486 F.3d
     1149, 1152-54 (9th Cir. 2007) (holding that such an obligation stems from the application of SSR
     00-4p).

28                                                        14

*United States District Court*
*Northern District of California*

1    Instead of relying on the vocational expert's testimony, Plaintiff appears to argue that the

2    ALJ should have extracted alternative job availability information from the Bureau of Labor.  Pl.'s

3    Mot. at 4-5.  Plaintiff concludes that the DOT listing for garment sorter corresponds with the

4    Department of Labor statistics for "production workers, all others" with the subcategories of

5    "other textile product mills" and "cut and sew apparel manufacturing."  *Id.* at 4-5 and Ex. 1.  By

6    limiting the inquiry to this subset of jobs, Plaintiff concludes that there are only 650 "garment

7    sorter" jobs in the entire country.  *Id.* at 5.  However, even assuming that there is any relevance to

8    Plaintiff's conclusions, she is not the vocational expert, and there is no indication that she is

9    qualified to assess such data.

10    Further, Plaintiff has presented no authority establishing that the Court should accept her

11    version of job availability over that of the unchallenged testimony of the vocational expert.

12    Plaintiff cites to *Farias v. Colvin*, 519 Fed. App'x. 439 (9th Cir. May 10, 2013), in support of her

13    position, arguing that the Ninth Circuit "took notice of Bureau of Labor published statistics

14    regarding the number of jobs nationally available based on census data."  Pl.'s Mot. at 4.

15    However, although the Ninth Circuit referred to the Bureau of Labor statistics in *Farias*, the actual

16    issue in that case was not the vocational expert's method for obtaining the job numbers

17    themselves, but the job description to which she attributed those numbers.  *Farias*, 519 Fed.

18    App'x. at 440.  In *Farias*, the vocational expert identified 3,600 "hostess" jobs, DOT 349.677-014,

19    in the local economy and 342,000 in the national economy.  *Id.* at 440.  The Ninth Circuit,

20    however, pointed out that the DOT description of the job with that number actually related to the

21    "Head" hostess of a "Dance Hall," which was described as involving activities such as introducing

22    "unaccompanied persons at dancehall" to the hosts/hostesses, explaining "procedure of engaging

23    social partner," and "[i]nspect[ing] dress of" hosts and hostesses."  *Id.*  Based on this description,

24    the *Farias* Court found that a "reasonable mind would not accept the [vocational expert's]

25    testimony that there are 3,600 head dance hall hostess positions in the local economy and 342,000

26    in the national economy."  *Id.*  *Farias* does not address the method by which a vocational expert

27    obtains job numbers.  Thus, Plaintiff's characterization of the Ninth Circuit's decision in *Farias* as

28

United States District Court
Northern District of California

15

1    an endorsement of her claim that "no reasonable person could accept the testimony of the

2    vocational expert when that testimony diverges so radically from the judicially noticed [Bureau of

3    Labor Statistics] published sources cited in cases" is without merit.  Accordingly, the Court finds

4    that the ALJ properly relied on the vocational expert's testimony that the identified jobs existed in

5    significant numbers in the national economy.  *See* 20 C.F.R. §§ 404.1566(d), (e), 416.966(d), (e);

6    SSR 00-4p; *Bayliss*, 427 F.3d at 1217-18.  Plaintiff's motion is therefore DENIED on this issue.

**B.      Plaintiff's Credibility**

8            In his decision, the ALJ found that Plaintiff's "statements concerning the intensity,

9    persistence and limiting effects of [her] symptoms were not credible to the extent they are

10   inconsistent with the above residual functional capacity assessment."  AR 29.  Plaintiff contends

11   that the ALJ improperly assessed her subjective symptom testimony in assessing the residual

12   function capacity.  Pl.'s Mot. at 8.  Specifically, Plaintiff argues that the ALJ erred in rejecting her

13   testimony "based on a belief that the testimony is not fully credible because that testimony is

14   inconsistent with what the ALJ believes it should be," rather than completing the analysis required

15   under the regulations.  *Id.* at 10.

             1.      Legal Standard

17           A two-step analysis is used when determining whether a claimant's testimony regarding

18   their subjective pain or symptoms is credible.  *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035-36 (9th

19   Cir. 2007).  First, it must be determined "whether the claimant has presented objective medical

20   evidence of an underlying impairment 'which could reasonably be expected to produce the pain or

21   other symptoms alleged.'"  *Id.* at 1036 (quoting *Bunnell v. Sullivan*, 947 F.2d 341, 344 (9th Cir.

22   1991) (en banc)).  A claimant does not need to "show that her impairment could reasonably be

23   expected to cause the severity of the symptom she has alleged; she need only show that it could

24   reasonably have caused some degree of the symptom."  *Id.* (quoting *Smolen v. Chater*, 80 F.3d

25   1273, 1282 (9th Cir. 1996)).

26           Second, if the claimant has met the first step and there is no evidence of malingering, "the

27   ALJ can reject the claimant's testimony about the severity of her symptoms only by offering

United States District Court
Northern District of California

16

1    specific, clear and convincing reasons for doing so." *Id.* (quoting *Smolen*, 80 F.3d at 1281). "The

2    ALJ must state specifically which testimony is not credible and what facts in the record lead to

3    that conclusion." *Smolen*, 80 F.3d at 1284. Where the ALJ "has made specific findings justifying

4    a decision to disbelieve an allegation of excess pain, and those findings are supported by

5    substantial evidence in the record," courts must not engage in second-guessing. *Fair v. Bowen*,

6    885 F.2d 597, 604 (9th Cir. 1989). However, a finding that the claimant lacks credibility cannot

7    be premised wholly on a lack of medical support for the severity of his pain. *Light v. Soc. Sec.*

8    *Admin.*, 119 F.3d 789, 793 (9th Cir. 1997) (citing *Lester v. Chater*, 81 F.3d 821, 834 (9th Cir.

9    1995); *Cotton v. Bowen*, 799 F.2d 1403, 1407 (9th Cir. 1986) ("'Excess pain' is, by definition,

10   pain that is unsupported by objective medical findings.").

11       Factors that an ALJ may consider in weighing a claimant's credibility include:

12   "[claimant's] reputation for truthfulness, inconsistencies either in [claimant's] testimony or

13   between [his] testimony and [his] conduct, claimant's daily activities, [his] work record, and

14   testimony from physicians and third parties concerning the nature, severity, and effect of the

15   symptoms of which claimant complains." *Thomas*, 278 F.3d at 958-59.

16       2.   Application to the Case at Bar

17       Here, the Court finds that the ALJ articulated specific and substantial reasons for his

18   credibility findings. AR 29-34. First, the ALJ found that Plaintiff's complaints as to the severity

19   of her symptoms were not credible because they were inconsistent with the weight of the medical

20   evidence in the record. AR 29; *see* 20 C.F.R. §§ 404.1529(c)(2), 416.929(c)(2) (ALJ considers

21   objective evidence when assessing credibility). The ALJ noted that while Plaintiff testified that

22   she spends 15 or 20 days per month in bed, her mental health treatment records demonstrate that

23   her depression improved substantially after she began medication. AR 31. This finding is

24   supported by substantial evidence. On October 10, 2008, Plaintiff reported that she was feeling

25   better, had more clarity and was not crying. AR 700. On April 3, 2009, Plaintiff reported that she

26   was feeling better and that she had started back working out. AR 694. On February 26, 2010,

27   Plaintiff reported to her treating provider that she was "much better" and "much calmer" with no

28

United States District Court
Northern District of California

17

United States District Court
Northern District of California

1    more heart palpitations.  AR 31, 460.  Plaintiff had excellent hygiene, a cooperative attitude,

2    normal speech, congruent affect, good judgment, and good insight and impulse control.  AR 461.

3    Her cognition and thought process were normal.  AR 461.  Her treating provider specifically noted

4    that her medication response was positive and that she had no side effects from her medication.

5    AR 461.

6         On August 25, 2011, Plaintiff's therapist noted that she had "made significant progress in

7    her ability to develop stronger resiliency and maintenance of her awareness of her environment."

8    AR 845.  She was alert times four, and while stressed due to family issues, she was calm with no

9    pressure in her speech.  Her speech was "articulate and clear, thoughts were organized and

10   thoughtful."  AR 845.  On August 31, 2011, Plaintiff reported that her medications were managing

11   her pain better and that she was sleeping six to eight hours per night.  She reported feeling much

12   more capable of handling a stressful family situation due to her treatment.  AR 844.  On May 3,

13   2011, Plaintiff reported to Dr. Kaye that her flare-ups were better.  AR 798.  Dr. Kaye noted that

14   Plaintiff was not doing enough exercise and suggested that she increase her exercise by five

15   minutes every week.  AR 798-99.  On September 13, 2011, Plaintiff reported to Dr. Kaye that her

16   new medication had been very helpful and that she was "very happy with how she [was] doing."

17   AR 806.

18        In addition to Plaintiff's own reports of improvement, the ALJ also noted that State agency

19   psychologist Dr. Davis reviewed her mental health treatment records and concluded that she had

20   only mild restrictions in activities of daily living and social functioning, and moderate difficulties

21   in concentration, persistence and pace.  AR 33, 411.  As a State agency physician, Dr. Davis is a

22   recognized expert in Social Security disability evaluation.  SSR 96-6p (State agency doctors "are

23   highly qualified physicians" and "are experts in the evaluation of the medical issues in disability

24   claims under the Act").

25        With regard to Plaintiff's physical complaints, the consultative examiner conducted a

26   thorough examination of Plaintiff and concluded that she could stand and walk for a total of 4-6

27   hours per 8-hour workday, and that she could sit for up to 6 hours per workday.  AR 389.

28

18

1    However, Plaintiff testified that she could only walk about a block and could only stand for 10 or

2    15 minutes.  AR 59.  The ALJ properly relied on this discrepancy between the medical evidence

3    and Plaintiff's testimony in finding her not credible.  *Batson v. Comm'r of Soc. Sec.*, 359 F.3d

4    1190, 1196 (9th Cir. 2004) (ALJ properly discounted credibility based on the opinion of a

5    consultative physician who did not believe that the claimant's pain symptoms could be explained

6    on a physical basis and also opined that objectively the claimant's ability to work was not limited).

7         Inconsistencies between Plaintiff's statements and the medical evidence are valid reasons

8    for discounting her credibility.  *Bray v. Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219, 1227 (9th

9    Cir. 2009) (ALJ may consider, among other factors, the fact that claimant's "statements at her

10   hearing do not comport with objective evidence in her medical record"); *Morgan v. Comm'r*, 169

11   F.3d 595, 598 (9th Cir. 1999) (the "conflict between subjective testimony and objective medical

12   evidence led the ALJ to conclude that [the claimant's] subjective complaints reflected a lack of

13   credibility and a degree of exaggeration").  While the ALJ may not rely on objective evidence

14   alone to reject a Plaintiff's subjective complaints of pain, it is one factor properly considered in the

15   analysis.  *Rollins v. Massanari*, 261 F.3d 853, 857 (9th Cir. 2001)).  Thus, the ALJ was entitled to

16   consider this record evidence in finding that Plaintiff exaggerated her physical symptoms and

17   limitations.  *See Osenbrock v. Apfel*, 240 F.3d 1157, 1165-66 (9th Cir. 2001) (ALJ properly

18   discounted pain complaints where "neurological and orthopedic evaluations have revealed very

19   little evidence of any significant disabling abnormality of the claimant's upper or lower

20   extremities or spine").

21         The ALJ also based his credibility finding, in part, on the fact that Plaintiff described

22   activities of daily living that were inconsistent with the impairments she alleged.  AR 28, 30.  It is

23   appropriate for an ALJ to take such inconsistencies into account when evaluating a claimant's

24   credibility.  20 C.F.R. §§ 404.1527(c)(3)(i), 416.927(c)(3)(i) (daily activities relevant when

25   assessing credibility); SSR 96-7p (same); *Burch v. Barnhart*, 400 F.3d 676, 680-81 (9th Cir. 2005)

26   (claimant's allegations of disability properly discredited where claimant was able to care for her

27   own personal needs, cook, clean, shop, interact with her boyfriend, and manage finances).  Daily

28

United States District Court
Northern District of California

19

1    activities need not be commensurate with full-time work to show that Plaintiff's complaints were

2    not credible—her activities need only show that she exaggerated her symptoms and/or limitations.

3    *Valentine v. Astrue*, 574 F.3d 685, 694 (9th Cir. 2009) (ALJ properly recognized that daily

4    activities "did not suggest [the claimant] could return to his old job" but "did suggest that [the

5    claimant's] later claims about the severity of his limitations were exaggerated"); *see also Molina*,

6    674 F.3d at 1113 ("Even where those activities suggest some difficulty functioning, they may be

7    grounds for discrediting the claimant's testimony to the extent that they contradict claims of a

8    totally debilitating impairment") (citations omitted).

9           In his decision, the ALJ noted that Plaintiff reported that she spends 15 or 20 days per

10   month in bed and that this was "entirely inconsistent with her other testimony." AR 30.  These

11   findings by the ALJ are supported by substantial evidence as Plaintiff also testified that she is

12   active in her church, and that she attends (either in person or by phone) meetings twice per week.

13   AR 28, 61.  She testified that she does "a lot of letter writing in the ministry."  AR 61.  She also

14   goes out about once per week to visit people for her church.  AR 61-62.  She continues to

15   homeschool her son, although he has teachers through an online curriculum.  AR 62-63.  She

16   testified that she listens to music and reads.  AR 63-64.  She drives herself, and she cooks dinner.

17   AR 65.  Taken as a whole, these admitted activities of daily living suggest that Plaintiff does not

18   have debilitating limitations to the extent that she alleges.  *Molina*, 674 F.3d at 1112 ("ALJ may

19   consider inconsistencies either in the claimant's testimony or between the testimony and the

20   claimant's conduct"); *Berry v. Astrue*, 622 F.3d 1228, 1234 (9th Cir. 2010) ("[the claimant] was

21   not entirely credible because [of] contradictions between complaints in [his] 2005 activity

22   questionnaire and hearing testimony and some of his other self-reported activities").

23          Based on this analysis, the Court finds that the ALJ did not commit error in his

24   determination that Plaintiff's testimony as to the extent and severity of her symptoms and

25   limitations was not credible.  Further, as these findings are based on substantial evidence in the

26   record, the decision must be affirmed, even if the Court would have decided the matter differently.

27   *See Bayliss*, 427 F.3d at 1214 n.1 ("If the record would support more than one rational

28

United States District Court
Northern District of California

interpretation, we defer to the ALJ's decision"); *Burch*, 400 F.3d at 679 ("[w]here evidence is susceptible to more than one rational interpretation, it is the ALJ's conclusion that must be upheld").  Accordingly, Plaintiff's motion on this issue is also DENIED.

## VI.  CONCLUSION

For the reasons stated above, the Court DENIES Plaintiff's motion for summary judgment and GRANTS Defendant's cross-motion for summary judgment.  The Clerk shall enter judgment accordingly.

**IT IS SO ORDERED.**

Dated: November 24, 2014.

_____
MARIA-ELENA JAMES
United States Magistrate Judge